**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**STACY R. ULIANA**
Bargersville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES W. TATE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 84A04-1403-CR-140 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VIGO SUPERIOR COURT
The Honorable John T. Roach, Judge
Cause No. 84D01-1308-FA-2366

**December 22, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, James W. Tate (Tate), appeals his conviction of dealing in methamphetamine, a Class A felony, Ind. Code § 35-48-4-1.1(a)(2)(C),(b)(1) (2013); and resisting law enforcement, a Class A misdemeanor, I.C. § 35-44.1-3-1(a)(3).

We affirm.

## ISSUES

Tate raises two issues on appeal, which we restate as follows:

(1) Whether the State presented sufficient evidence to support Tate's conviction of dealing in methamphetamine; and

(2) Whether the State committed prosecutorial misconduct amounting to fundamental error.

## FACTS AND PROCEDURAL HISTORY

Shortly before 2:00 a.m. on August 6, 2013, the Terre Haute Police Department broadcasted a dispatch advising officers to be on the lookout for a white male in a red shirt, driving a motorcycle northbound on U.S. Highway 41/Third Street "at a high rate of speed with no lights weaving in and out of traffic, driving recklessly." (Transcript p. 264). At the time of the dispatch, Officer Ryan Adamson (Officer Adamson) and his K-9 partner, Carón, were driving south on Third Street toward the approaching motorcycle. A short time later, when the motorcyclist passed by his patrol vehicle, Officer Adamson observed that the motorcycle's taillights were not working, so he initiated a traffic stop. Because it was an otherwise uneventful night for law enforcement in Vigo County, Indiana,

2

approximately six additional officers subsequently arrived to serve as back-up or "just to see what[] [was] going on." (Tr. p. 266).

Having identified the driver of the motorcycle as Tate, Officer Adamson explained his reason for making the traffic stop. Tate responded that he was from Indianapolis, that he had borrowed the motorcycle from a friend, and that he did not know why the taillights were not functioning properly. After verifying that the motorcycle was not stolen, Officer Adamson decided to issue a citation for the taillights and send Tate on his way. Before doing so, Officer Adamson questioned Tate as to whether he was in possession of anything illegal and whether he had any issues with narcotics, to which Tate admitted having "a problem with methamphetamine." (Tr. p. 269). When Officer Adamson asked Tate if he had any methamphetamine on him, Tate—despite the heavy presence of law enforcement—fled from the scene on foot.

Officer Adamson and the other officers pursued Tate in their police vehicles while Officer Brad Birchfield (Officer Birchfield) chased him on foot. As the officers closed in on Tate, Officer Adamson released Carón to assist in the apprehension, but Officer Birchfield reached Tate first and subdued him with a taser. Before Officer Birchfield could place Tate in handcuffs, he noticed that Tate had shoved something in his mouth. Tate disregarded Officer Birchfield's command to spit out "what appeared to be . . . a crystal-like substance . . . inside baggies[,]" so Officer Adamson used his finger to flick four small plastic bags out of Tate's mouth. (Tr. p. 274). Officer Birchfield retraced the path Tate had taken and discovered a fifth plastic bag containing the same crystal-like substance. It was later established that each of the five plastic bags contained methamphetamine,

3

weighing 1.38 grams, 6.24 grams, 6.65 grams, 6.07 grams, and 3.87 grams, for a total of 24.21 grams.

The following day, the State filed an Information, charging Tate with Count I, dealing in methamphetamine, a Class A felony, I.C. § 35-48-4-1.1(a)(2)(c),(b)(1); Count II, possession of methamphetamine, a Class C felony, I.C. § 35-48-4-6.1(a),(b)(1); Count III, maintaining a common nuisance, a Class D felony, I.C. § 35-48-4-13(b); and Count IV, resisting law enforcement, a Class A misdemeanor, I.C. § 35-44.1-3-1(a)(3). On February 3 and 4, 2014, a jury trial was conducted. After resting its case-in-chief, the State moved to dismiss the charge for maintaining a common nuisance, which the trial court granted. At the close of the evidence, the jury returned a guilty verdict as to the remaining three Counts. At the sentencing hearing on March 3, 2014, after merging Tate's conviction on Count II into Count I as a lesser included offense, the trial court imposed a thirty-five-year executed sentence for dealing in methamphetamine and a concurrent one-year term for resisting law enforcement.

Tate now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Sufficiency of the Evidence*

Tate claims that there is insufficient evidence to uphold his conviction for dealing in methamphetamine. When considering a claim of insufficient evidence, our court applies a long-settled standard of review, whereby we neither reweigh evidence nor assess the credibility of witnesses. *Richardson v. State*, 856 N.E.2d 1222, 1227 (Ind. Ct. App. 2006), *trans. denied*. Instead, we consider only the evidence most favorable to the verdict, along

4

with any inferences that may reasonably be derived therefrom. *Id.* If there is probative evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt, we will affirm the conviction. *Gaynor v. State*, 914 N.E.2d 815, 818 (Ind. Ct. App. 2009), *trans. denied*.

To convict Tate of dealing in methamphetamine as a Class A felony, the State had to prove beyond a reasonable doubt that that he possessed, with the intent to deliver, three or more grams of "methamphetamine, pure or adulterated." I.C. § 35-48-4-1.1(a)(2)(C), (b)(1). Tate concedes that he was in possession of 24.21 grams of methamphetamine, but he argues that the State failed to present sufficient evidence of his intent to deliver. It is well established that either direct or circumstantial evidence may be used to prove an intent to deliver. *Davis v. State*, 863 N.E.2d 1218, 1220 (Ind. Ct. App. 2007), *trans. denied*. Intent is a mental state; thus, "absent an admission, the trier of fact must resort to reasonable inferences based upon an examination of the surrounding circumstances to determine whether, from the person's conduct and the natural consequences thereof, a showing or inference of intent to commit that conduct exists." *Isom v. State*, 589 N.E.2d 245, 247 (Ind. Ct. App. 1992), *trans. denied*.

Indiana courts have long held that the "'[p]ossession of a substantial amount of narcotics constitutes circumstantial evidence of intent to deliver,' and '[i]f the quantity is such that it could not be personally consumed or used, then an inference of a predisposition to sell can reasonably be drawn.'" *Hape v. State*, 903 N.E.2d 977, 997-98 (Ind. Ct. App. 2009) (quoting *Goodner v. State*, 685 N.E.2d 1058, 1062 n.4 (Ind. 1997)), *trans. denied*. However, subsequent to the filing of this appeal, the Indiana General Assembly amended

Indiana Code section 35-48-4-1.1(b) to now require that a conviction of dealing in methamphetamine be supported by "evidence in addition to the weight of the drug that the person intended to . . . deliver . . . the drug." *See* Ind. Pub. L. No. 168-2014, § 92. This amendment went into effect on July 1, 2014. Per the rules of statutory construction, statutes must be applied on a prospective basis "unless the legislature unequivocally and unambiguously intended retrospective effect as well." *Brown v. State*, 947 N.E.2d 486, 490 (Ind. Ct. App. 2011), *trans. denied*.

An exception to this rule permits the retrospective application of statutes that are remedial—that is, statutes which are intended to cure a defect in a prior statute or are enacted in response to case law—if there are strong and compelling reasons for doing so. *Id.* In the present case, Tate argues that the 2014 amendment is remedial in nature and, therefore, should be applied retroactively to his offense. Because we disagree with Tate's contention that the State failed to present any evidence in addition to the weight of the methamphetamine, we need not address whether retroactive application of the amendment is appropriate.[1]

The evidence reveals that Tate possessed 24.21 grams of methamphetamine, which was the largest amount recovered during any arrest in which Officer Birchfield has been involved. Additionally, Officer Adamson testified that in his experience with methamphetamine arrests, the usual quantity at stake is one gram or less, and although it

---

[1] Even absent our finding of evidence beyond the weight of the methamphetamine, we would decline to address Tate's claim. In Footnote 3 of his brief, Tate restates the general rule for retroactive remedial statutes, but he does not analyze how the rule should be applied in the present case or otherwise support his claim with cogent reasoning. Thus, he has waived his argument. Ind. Appellate Rule 46(A)(8)(a).

6

varies by individual, a methamphetamine addict is likely to consume only "a gram every couple days." (Tr. p. 321). "The more narcotics a person possesses, the stronger the inference that he intended to deliver it and not consume it personally." *Love v. State*, 741 N.E.2d 789, 792 (Ind. Ct. App. 2001).

Furthermore, the fact that a large supply of drugs is distributed among several small bags instead of stored in one large container may create an inference that the drugs are packaged for sale rather than for personal consumption. *Davis v. State*, 791 N.E.2d 266, 270 (Ind. Ct. App. 2003), *trans. denied*. Here, Tate's methamphetamine was divided into five "corner-cut [plastic] baggies." (Tr. p. 292). As Officer Adamson testified, this type of packaging is indicative of dealing:

> For example, if I stop a, a guy or a girl, and they have one (1) corner-cut baggie, with a gram, I would assume from my training and experience that that's for personal use. In my training and experience, people don't sell one (1) gram at a time. Now if, if a person has multiple one (1) gram bags, or if they have multiple bags with any amount, that tells me, through my training and experience, that their . . . purpose is beyond personal use.

(Tr. p. 294). Officer Adamson also found it noteworthy that Tate was not carrying a pipe or any other device for ingesting the methamphetamine, which is more consistent with dealing than using the drug. *Love*, 741 N.E.2d at 792.

On the other hand, Tate contends that the evidence supports only a finding that he is an addict who intended to personally use—not deliver—the methamphetamine. As such, he posits that the State did not present evidence of cell phone records or the possession of large sums of cash to demonstrate dealing activity. He further asserts that the packaging is not consistent with an intent to deliver because "[t]he methamphetamine was not

7

separated in any logical or typical amounts for distribution." (Appellant's Br. p. 9). Finally, Tate directs our attention to *Isom v. State*, 589 N.E.2d at 247, in which our court noted that the packaging will be the same regardless of whether the person just purchased the drugs or just sold the drugs.

Our concern on appeal is whether there is evidence in the record from which the jury could reasonably have inferred an intent to deliver. Officer Adamson testified that methamphetamine has an approximate street value of $100 or more per gram. Considering that Tate was in possession of nearly $2,500 worth of methamphetamine yet had no paraphernalia to ingest it, along with the fact that he was from out-of-town and driving through Terre Haute in the middle of the night, the jury *could* reasonably have inferred that Tate had recently acquired his supply of methamphetamine with the intent to sell it upon his return to Indianapolis. Accordingly, we find that the State presented sufficient evidence to support Tate's conviction of dealing in methamphetamine.

## II. *Prosecutorial Misconduct*

Next, Tate challenges his conviction on grounds of prosecutorial misconduct, pointing to remarks made by the State during closing argument. In reviewing a claim of prosecutorial misconduct, our court must first determine whether the State's conduct constitutes misconduct. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). If we find that misconduct occurred, we next consider "'whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected' otherwise." *Id.* (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). We look to case law and the Rules of Professional Conduct to ascertain

8

whether a prosecutor has engaged in misconduct. *Id.* "The gravity of peril is measured by *the probable persuasive effect* of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct." *Id.* (quoting *Cooper*, 854 N.E.2d at 835). In assessing the degree of impropriety, we will consider the prosecutor's statements "in the context of the argument as a whole." *Washington v. State*, 902 N.E.2d 280, 290 (Ind. Ct. App. 2009), *trans. denied*.

In order to preserve a claim of prosecutorial misconduct for appeal, "the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial." *Ryan*, 9 N.E.3d at 667. Tate concedes that did not object in accordance with this procedure and, therefore, has waived appellate review of the claim. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). Nonetheless, a defendant may avoid procedural default "if the prosecutorial misconduct amounts to fundamental error." *Id.* Thus, to succeed on appeal, Tate must establish not only the grounds for prosecutorial misconduct, but also that the prosecutorial misconduct constituted fundamental error. *Ryan*, 9 N.E.3d at 667-68.

The fundamental error doctrine "is an 'extremely narrow exception' to the contemporaneous objection rule that allows a defendant to avoid waiver of an issue." *Neville v. State*, 976 N.E.2d 1252, 1258 (Ind. Ct. App. 2012) (quoting *Cooper*, 854 N.E.2d at 835), *trans. denied*. Prosecutorial misconduct amounts to fundamental error if it "make[s] a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process, [or if it] present[s] an undeniable and substantial potential for harm." *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002). The fact that a

9

defendant is ultimately convicted does not establish the element of harm. *Neville*, 976 N.E.2d at 1259. "Rather, it depends upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled." *Id.* Accordingly, Tate asserts that the State's comments during the closing argument not only constituted prosecutorial misconduct, but denied him a fair trial.

During the trial, Officer Adamson testified that when an individual found to be in possession of drugs is also in possession of cash, it is an indication that he or she is dealing rather than simply using the drugs. Because it is undisputed that Tate did not have cash on him at the time of his arrest, the defense argued that this fact negated any intent to deliver. In the State's rebuttal during closing argument, the prosecutor made the following statement:

> Why doesn't [Tate] have cash? Who knows. Maybe he works for somebody. Maybe he sells and then he gets to use. They, you know, as Officer Adamson testified, they, they get a fee, you know, what they do in a certain way.

(Tr. p. 444). According to Tate, "Officer Adamson did not testify to this." (Appellant's Br. p. 11). Instead, he argues that "the trial court sustained [his] objection to Officer Adamson's testimony as to 'other ways' a person can get paid fo[r] dealing drugs[,]" so "[t]he fact that the prosecutor still argued some type of fee-arrangement to explain Tate's lack of money" was improper. (Appellant's Br. pp. 11-12).

It is clear that Tate's challenge to the commentary is based on a purported violation of Indiana Rule of Professional Conduct 3.4(e), which provides that "[a] lawyer shall not[,] . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or

10

that will not be supported by admissible evidence." With this Rule in mind, we also note that the State has a "duty to present a persuasive final argument." *Ryan*, 9 N.E.3d at 667. Thus, "[i]t is proper for a prosecutor to argue both law and fact during final argument and propound conclusions based upon his analysis of the evidence." *Hand v. State*, 863 N.E.2d 386, 394 (Ind. Ct. App. 2007). In addition, a prosecutor may "respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Id.*

Contrary to Tate's claim, we find that the following colloquy between the prosecutor and Officer Adamson provides an evidentiary basis for the prosecutor's statement:

> Q. Can a person be a dealer and not have a large amount of cash on them at the time?
> A. Sure.
> Q. How could that work in your opinion . . . and from your experience . . . , give us an opinion and an example how that would work. How can you deal without a lot, large amount of cash? Since you testified that typically a large amount of cash is consistent with dealing, how can you do that without?
> A. Well, people that are . . . friends that . . . sell narcotics together will front people narcotics. . . .
> Q. What do you mean by front?
> A. What I mean by that is, if I give you this, you go out and sell it, and then you can give me the money. A . . . loan basically if you will. They don't do that with . . . [the] average person because they don't know Joe Blow walking in off the streets. They do that with people they trust.
> Q. So how does the person consummate, how do they pay the person where they got the drug, or dealer, that they're –
> A. They would sell it and . . . pay the person back for it.

(Tr. pp. 301-02). Tate did not object to this line of questioning. Accordingly, because the State's comment has a foundation in the record, we find that it did not constitute misconduct and need not reach the level of fundamental error.

## CONCLUSION

Based on the foregoing, we conclude that the State presented sufficient evidence to support Tate's conviction of dealing in methamphetamine and further conclude that the State did not engage in prosecutorial misconduct.

Affirmed.

MATHIAS, J. and CRONE, J. concur